IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER HICKS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 13 C 989 |
| BARRY CLARK, et al., | ) ) ) |
| Defendants. | ) |

### **MEMORANDUM OPINION AND ORDER**[1]

Just short of four decades have elapsed since Christopher Hicks ("Hicks") was appallingly returned to the custody of his adoptive mother Gloria Jemmison ("Jemmison") despite the unquestioned and serious child abuse that he had sustained at her hands and that had led to Department's originally ousting her from such custody only a few months earlier. And even more appallingly, that pattern of grievous physical abuse not only resumed immediately but actually worsened during the next few years -- abuse that was fully documented and well known to Department and its cohorts[2] -- until Jemmison's custody of Hicks was finally revoked

---

[1] This memorandum opinion and order memorializes and formalizes in written form the rulings announced by this Court in its extended oral in-court statement on June 1. On reflection this Court has decided that the analysis tendered by defendant Department of Children and Family Services ("Department") and its related co-defendants was so fundamentally flawed that a full-blown exposition of its defective nature will serve the public interest.

[2] Third Amended Complaint ("TAC") ¶¶ 35, 36, 47, 49, 51, 53, 55 and 57, which must of course be credited for Fed. R. Civ. P. ("Rule") 12(b)(6) purposes, recount documented evidence of the sheer cruelty repeatedly practiced by Jemmison against the helpless child then in her charge. To characterize her as Hicks' "mother" does total violence to the normal connotations of that label in the English language.

permanently.[3] According to Hicks, his long-repressed memory of that deplorable situation has emerged from the depths of despond only recently, and he seeks recompense for that horrific experience through this 42 U.S.C. § 1983 ("Section 1983") action, coupled with related state law claims under the auspices of the supplemental jurisdiction provision of 28 U.S.C. § 1367.

At this point the most recent reiteration of Hicks' claims is embodied in his TAC,[4] and the two sets of defendants have taken aim at that pleading by separate motions. Because the motion by Department and its cohorts advanced a "Gotcha!" type of argument of qualified immunity that sought to rest on a similar child abuse case that rejected legal responsibility on the part of a Wisconsin state agency (DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189 (1989)), this Court's immediate response was to focus defense counsel's attention on the obvious proposition that it was totally improper to judge defendants' conduct during the 1970s and very early 1980s by a standard not announced by the United States Supreme Court until a decade later -- a kind of "post hoc ergo propter hoc" approach.[5]

---

[3] According to TAC ¶¶ 23 and 5, the time during which Hicks was subjected to Jemmison's brutality spanned his years from age 3 through age 8.

[4] Hicks' counsel had earlier filed a motion to strike some affirmative defenses from the response to his Second Amended Complaint. This Court's brief April 21, 2015 memorandum order granted leave for the filing of Hicks' then-proposed TAC and ordered the two sets of defendants in this case to file responsive pleadings to that restatement on or before May 12. That of course logically rendered Hicks' earlier motion [Dkt. 118] moot, and this Court's oral June 1 rulings began with the denial of that motion on mootness grounds. It should be stressed, however, that the contentions advanced by Hicks in his earlier motion would have equal force if either set of defendants were to ignore the teaching for defense counsel set out in App'x ¶ 5 to this Court's opinion in State Farm Mut. Auto. Ins. Co. v. Riley, 199 F.R.D. 276, 279 (N.D. Ill. 2001).

[5] Even apart from the time warp that torpedoes the effort by counsel for Department and its cohorts to look to DeShaney as precedential support for their position in this case, their counsel has also missed the irony implicit in the DeShaney majority's reference to the harms

(continued)

Indeed, startlingly enough, it was DeShaney itself -- in both the majority opinion authored by then Chief Justice Rehnquist and the powerful dissent voiced by Justice Brennan for himself and two other justices[6] -- that pointed the way toward upholding rather than rejecting Hicks' TAC here: Each of those opinions expressly adverted to Estelle v. Gamble, 429 U.S. 97 (1976) and the later (and conceptually parallel) decision in Youngberg v. Romeo, 457 U.S. 307 (1982) as exemplifying the law as of the time that is relevant for evaluation of the litigants' rights and duties in this case. Because that reasoning is so dramatically demonstrated by those two opinions, which led to disagreement within the Supreme Court in DeShaney but both of which really call for upholding Hicks' claim here, this opinion will quote extensively from the Justices' respective expositions (omitting internal citations, quotation marks and footnotes).

First, then, here is a slightly (but not substantively) bobtailed reproduction of the now-relevant portions of Chief Justice Rehnquist's statement in DeShaney, 489 U.S. 198-200 (emphasis added):

> In Estelle v. Gamble, 429 U. S. 97 (1976), we recognized that the Eighth Amendment's prohibition against cruel and unusual punishment, made applicable to the States through the Fourteenth Amendment's Due Process Clause, requires the State to provide adequate medical care to incarcerated prisoners. We reasoned that, because the prisoner is unable "by reason of the deprivation of his liberty [to] care for himself," it is only "just" that the State be required to care for him.

_____
(footnote continued)
suffered by the youngster there as having "occurred not while he was in the State's custody, but while he was in the custody of his natural father" (489 U.S. at 201, emphasis added), while by contrast in this case Hicks was in the custody of his quite unnatural mother Jemmison (see n.2).

[6] This Court freely acknowledges that if it were approaching the issue by writing on a clean slate, it would be inclined to favor Justice Brennan's dissenting position (and the poignant brief additional dissent by Justice Blackman) over the narrower reading set out in Chief Justice Rehnquist's majority opinion. That however has not impacted at all on this opinion or on the stance taken here, for this Court of course recognizes and respects the DeShaney majority opinion as the controlling law of the land today.

In <u>Youngberg v. Romeo</u>, 457 U. S. 307 (1982), we extended this analysis beyond the Eighth Amendment setting, holding that the substantive component of the Fourteenth Amendment's Due Process Clause, requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their "reasonable safety" from themselves and others. As we explained: "If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed -- who may not be punished at all -- in unsafe conditions."

But these cases, . . . [t]aken together, . . . stand only for the proposition that, when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. See <u>Youngberg v. Romeo</u>, <u>supra</u>, at 317 ("When a person is institutionalized -- and wholly dependent on the State[,] . . . a duty to provide certain services and care does exist"). The rationale for this principle is simple enough: when the State, by the affirmative exercise of its power, so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs -- e.g., food, clothing, shelter, medical care, and <u>reasonable</u> <u>safety</u> -- it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. See <u>Estelle v. Gamble</u>, <u>supra</u>, at 103-104; <u>Youngberg v. Romeo</u>, <u>supra</u>, at 315-316. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. See <u>Estelle v. Gamble</u>, <u>supra</u>, at 429 U. S. 103 ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met"). In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf -- through incarceration, institutionalization, or <u>other similar restraint of personal liberty</u> -- which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

And here is the identical lesson that Justice Brennan drew in <u>DeShaney</u>, 489 U.S. at 205 from <u>Estelle</u> and its later compatriot <u>Youngberg</u>:

Both <u>Estelle v. Gamble</u>, 429 U. S. 97 (1976), and <u>Youngberg v. Romeo</u>, 457 U. S. 307 (1982), began by emphasizing that the States had confined J. W. Gamble to prison and Nicholas Romeo to a psychiatric hospital. This initial action rendered these people helpless to help themselves or to seek help from persons unconnected to the government. See <u>Estelle</u>, <u>supra</u>, at 104 ("[I]t is but just that the public be required to care for the prisoner, who cannot by reason of the

- 4 -

deprivation of his liberty, care for himself"); , at 104 ("[I]t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself"); Youngberg, supra, at 317 ("When a person is institutionalized -- and wholly dependent on the State -- it is conceded by petitioners that a duty to provide certain services and care does exist"). Cases from the lower courts also recognize that a State's actions can be decisive in assessing the constitutional significance of subsequent inaction. For these purposes, moreover, actual physical restraint is not the only state action that has been considered relevant.

Indeed, Chief Justice Rehnquist's majority opinion recognized that other courts have found a parallel between the teaching of Estelle and Youngberg and the situation posed for consideration in this case. Here is the relevant portion of n.9 to that opinion (489 U.S. at 201, citations omitted):

> Had the state by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect. Indeed, several Courts of Appeals have held, by analogy to Estelle and Youngberg, that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents.

Although the Supreme Court majority did not opine "on the validity of this analogy," this Court holds that defendants can take no comfort from any attempted distinction, at the time relevant for judging the availability or unavailability of qualified immunity in the fact-bound antecedents to DeShaney, between foster parents and the appallingly non-maternal "mother" Jemmison.

It is important to note in that respect how the Illinois Abused and Neglected Child Reporting Act at 325 ILCS 5/2 defines Department's role in cases such as this one:

> The Illinois Department of Children and Family Services shall, upon receiving reports made under this Act, protect the health, safety, and best interest of the child in all situations in which the child is vulnerable to child abuse or neglect, offer protective services in order to prevent any further harm to the child and to other children in the same environment or family, stabilize the home environment, and preserve family life whenever possible.

No limitation is placed there on whether the severe abuse visited on a child such as Hicks is inflicted by a foster parent or by an adoptive "mother" such as Jemmison, who abused her status as a parent just as she abused Hicks himself.

In another effort to "make the worse appear the better reason,"[7] Department's counsel retreated to point out during the June 1 hearing (Tr. 28:24) that "it was the State Court who removed -- who returned him." That is really an unsupportable attempt at a cop-out. Was the state court acting sua sponte? Of course not. It was the duty of Department and its cohorts to present the facts that would have spared Hicks renewed torture at Jemmison's hands. It simply will not do for those defendants' counsel to try to shift responsibility in that fashion.

All of that, then, spells defeat for the attempted dismissal of the defendants referred to here as "Department and its cohorts." But a few words should be added about the separately represented co-defendants whose counsel did not predicate their motion to dismiss in DeShaney terms.

On that score it is only necessary to say that the TAC's allegations -- once again credited for Rule 12(b)(6) purposes in accordance with the "plausibility" standard established by the Twombly-Iqbal dichotomy -- are adequate to tar those defendants with the same "color of law" brush as Department and its cohorts, and that the related state law claims are sustainable on the premise of those defendants' asserted complicity in the wrongs suffered by Hicks (a subject that clearly calls for factual development). And that counsels the denial of their motion to dismiss at this threshold stage as well.

---

[7] That felicitous phraseology first appeared in Diogenes' Socrates more than two millenia ago -- and John Milton paid tribute to its felicitousness by repeating it in his Paradise Lost more than 1800 years later.

**Conclusion**

For the reasons announced orally during this Court's June 1 hearing and recast in written form here, all defendants' motions for dismissal from Hicks' TAC are denied, and all defendants are ordered to file answers to the TAC on or before June 29, 2015. Finally, a status hearing is set for 9 a.m. July 13, 2015.

_____
Milton I. Shadur
Senior United States District Judge

Date:  June 4, 2015