IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER HICKS**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13 C 989 |
| | ) | |
| **BARRY CLARK, et al**, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Many years after suffering the child abuse that forms the gravamen of his claims, Christopher Hicks ("Hicks") filed a 42 U.S.C. §1983 ("Section 1983") action charging violations of due process, failure to intervene and supervisory liability, as well as several related state law tort claims, against a number of defendants, including Elmira Wright ("Wright"), Brodie Westbrooks and UCAN (formerly known as Child and Family Services).[1] Those claims stem from injuries that Hicks sustained while he was in the foster care system in the home of Gloria Jemison ("Jemison") between February 1974 and April 1981, when Hicks was permanently removed from the home at the age of eight. Although various other motions by both sides to the litigation are pending, this memorandum opinion and order deals with Movants' motion (Dkt. No. 264) for summary judgment under Fed. R. Civ. P. ("Rule") 56 on statute of limitations grounds.

---

[1] In light of the limited scope of this opinion, which does not address the other still-pending motions in the case, those three defendants are referred to here by the collective label "Movants."

1

Background[2]

Both sides agree on several facts. Hicks was placed in the care of the Department of Children and Family Services ("DCFS") upon his birth in 1973 (M. St. ¶¶ 6-8). Soon after that he was placed with Jemison (id. ¶¶ 9). After several reports of really serious abuse by Jemison, DCFS assigned FamilyCare of Illinois ("FCI") and Wright to provide counseling to ensure Hicks' well-being (id. ¶¶ 12-13).[3] Despite that assignment, in September 1977 Hicks ended up in the hospital as a result of further severe abuse, and he was then removed from the Jemison home (id. ¶¶ 14-16). In July 1978 Hicks (then age 4) was returned to the Jemison home pursuant to a Juvenile Court judge's order, again under the court-ordered supervision of FCI and Wright (id. ¶ 17).

In other filings, primarily in their dispute (Dkt. Nos. 253-255, 261) over whether or not Dr. Ronald Davidson should be excluded, the two sides disagree on what transpired in connection with the entry of the court order to return Hicks to the Jemison home. For their part Movants assert that Wright strongly opposed returning Hicks in light of the possibility of future abuse. Hicks counters with a citation to Jemison's deposition to the contrary, as well as to the specific words "by agreement" in the court order to argue that there was no resistance from Wright. In a summary judgment motion such as this one, this Court reads all evidentiary-

---

[2] LR 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon. This opinion cites to Movants' LR 56.1 statement as "M. St. ¶ —" and, because there was no requirement for a response from Hicks, it cites to Hicks' Third Amended Complaint as "TAC ¶ —" . All of the factual statements that follow are undisputed unless specifically noted otherwise.

[3] At the time of Hicks' placement the name of the agency assigned to oversee the foster care system, and specifically Hicks, was called FCI. That agency no longer exists, and according to plaintiff it is now known as UCAN (TAC ¶¶ 16-17). For the purposes of this opinion, UCAN is treated as if it is FCI with a name change.

supported disputed facts in a light most favorable to nonmovant Hicks. Here there is clearly enough evidence to call for the acceptance of Hicks' version as true for the purposes of this opinion.

Hicks alleges, and Movants have proffered no evidence to the contrary, that abuse continued when Hicks was returned to the home--and Movants make no claim of their noncompliance with their statutory (and court-ordered) responsibility to monitor Hicks' treatment there. Yet despite the deplorable history of continuing abuse by Jemison, Wright makes no claim of doing anything to prevent DCFS from closing the file in August 1979 (id. ¶ 20, TAC ¶¶ 45-46). That severe abuse continued after DCFS closed the file until Hicks was once again (and finally) removed from the Jemison home more than 1-1/2 years later--in April 1981--after spending weeks in the hospital (M. St. ¶ 21, TAC ¶¶ 47-59).

In May 2012 Hicks secured his DCFS records that detailed his time in the Jemison home (M. St. ¶ 25). According to Hicks that came about because of recent therapy sessions during which suppressed memories of the abuse had resurfaced while he was dealing with a struggling marriage (TAC ¶¶ 62-63). Hicks alleges that he felt a need to search for his biological parents, and in doing so he received DCFS records that contained instances of terrible abuse and neglect that horrified him (id. ¶¶ 63-64). Importantly, he then discovered for the first time that the DCFS and its people had full knowledge of the abuse yet allowed his return to the "care" (an ironic euphemism) of Jemison. Although Hicks had some memories of the abuse itself before he found the file, he never remembered that he had been taken out of and later returned to the home, and

there is no evidence that he had any knowledge of how much Movants knew about the abuse yet violated their statutory duties so as to foster[4] Hicks' renewed victimization at Jemison's hands.

## Legal Standards

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seak Co., 282 F.3d 467, 471 (7th Cir. 2002)). Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to drawn from the facts" in resolving motions for summary judgment (Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for trial (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

## Movants' Limitations Contentions

Movants present a consistent (though misguided) argument in their attempted--but unsuccessful--support of the claimed need to grant summary judgment in their favor on the statute of limitations defense. There is no dispute as to how long the statute of limitations is for this type of case (two years)--instead the crux of the matter comes down to when that two year

---

[4] This is not intended as a play on words--instead it is an apt description of the direct causal role played by Movants in this depressing saga--a causal role addressed in this opinion's ensuing legal analysis.

clock began to tick.  As Movants would have it, the time began to run for Hicks when he reached 18 years of age.

To that end Movants cite several cases stating that the limitations period starts to run when a plaintiff has discovered both the injuries and the cause of those injuries.  They also point to evidence to suggest that Hicks knew of both his injuries and as to Jemison being the direct cause of his injuries by the time he turned 18, well over two years before he brought this case.  That evidence includes his knowledge of defendant Wright's existence and of DCFS's presence when he was a child, as well as statements regarding memories of his abuse, dating back more than two years before he filed this action.  Movants reject the ideas that Hicks can legally bring suit within the statute of limitations under a theory of delayed knowledge of their inaction or of the extent of his injuries or under a general equitable tolling doctrine.

But all of those arguments miss the mark entirely, because they fail to focus on the time that Hicks acquired the knowledge that is critical to the claim that he advances here.  For even if this Court were to take all of the facts advanced by Movants as true, Hicks' present claims would still be timely.

In identifying when the statute of limitations begins to run, a key distinction must be made between a victim's knowledge that an injury has been wrongfully caused and the victim's first learning that the targeted defendants caused the injury sued upon in a sense expressly made actionable under Section 1983.  For that purpose it is vital to note that Section 1983 itself imposes liability on any person who under color of law either "subjects, or <u>causes to be subjected</u>" (emphasis added) a victim to the deprivation of that person's constitutional rights.

At this point in the narrative any rational presentation must shift focus to the highly relevant subjects on which Movants' presentation offers only silence: the mandate and goals of

5

the statute that Movants were charged with carrying out and the role that Movants played--or tragically did <u>not</u> play--in carrying out that charge. It must always be kept in mind that the return of Hicks to Jemison's known brutality equated to Judge Easterbrook's trenchant description years later in the later-discussed <u>Paine</u> case (678 F.3d at 510):

> They might as well have released her into the lions' den at the Brookfield Zoo. See <u>Bowers v. DeVito</u>, 686 F.2d 616, 618 (7th Cir. 1982), which anticipated <u>DeShaney</u> but added that throwing someone into a snake pit would violate the due process clause.

In that respect defense counsel prefers to ignore why the Illinois General Assembly enacted the statute that created the DCFS to begin with: Ill. Rev. Stat. ch. 23 § 5005 (1977) (emphasis added) mandated that DCFS provide direct child welfare services by "(1) <u>preventing</u> or <u>remedying</u> or assisting in the solution of problems which may result in the neglect, <u>abuse</u>, or exploitation of children". And in this instance Jemison had generated more than ample evidence that her adoption of Hicks had simply converted her from an abusive caregiver to an abusive parent, a situation confirmed by the order of the Illinois Juvenile Court judge in continuing the supervision by defendants over Jemison's treatment of the very young Hicks.

Here Hicks' patchwork memories of abuse at the hands of Jemison (the one who directly subjected Hicks to that abuse) did not start the relevant two year clock ticking--that knowledge would of course bar a belated lawsuit against Jemison or her estate, but the critical fact for this action is that Hicks' long suppressed memory had left him unaware that DCFS and its cohorts (the ones who caused Hicks to be so subjected by their culpability in connection with his return to Jemison's home and the further abuse that he then continued to suffer for another 3 years) did so with full knowledge that it was a seriously abusive place, thus betraying their fiduciary obligation to spare him from such abuse. Only the actions of DCFS and FCI in knowingly implementing his replacement and retention in harm's way at the hands of known child abuser

6

Jemison are the relevant cause of his injuries for the purposes of this lawsuit. Movants' duty to protect Hicks against the further physical abuse that he then suffered arises out of the ongoing special relationship between FCI and Hicks, so that Movants' actions constituted an actionable cause in the express manner prescribed by the earlier-underscored language ("<u>causes</u> to be subjected") of Section 1983 (see, e.g., <u>Nicini v. Morra</u>, 212 F.3d 798, 807-08 (3d Cir. 2000) and cases cited there).

As stated earlier, Movants argue that the order returning Hicks to the abusive home was a judicial decision, not an action of DCFS or FCI. But in doing so Movants themselves abuse <u>their</u> special relationship with Hicks, for their egregious breach of their duty to him plainly played a key role in his return to the abusive household as well as in his nonremoval throughout months of continued abuse. DCFS as well as social workers have the burden to show that they did what they could to keep Hicks from being abused, but instead there is a deafening silence in that regard, save for the disputed claim from Wright that she protested the judicial decision. Their obligation was an active one, not a passive one.

Once again, in no part of either side's filings is there any evidence at all to suggest that Hicks knew of the role that DCFS and its people played in subjecting him to the grievous abuse for which he has sued after learning of that role. For Movants to argue that Hicks should have investigated DCFS earlier because of his experience as a day care owner is mere second guessing with a vengeance.

What Movants and their counsel have failed to recognize (or perhaps more accurately have refused to acknowledge) is that this case is conceptually parallel to a case such as <u>Paine v. Cason</u>, 678 F.3d 500, 510-11 (7th Cir. 2012), in which our Court of Appeals upheld Section 1983 liability on the part of state actors who also placed a victim in harm's way (the victim there

7

was a young woman who was raped under appalling circumstances), even though the resultant injury itself was inflicted by another actor (the rapist). Paine, id. at 510 cited the state actor as a separate and potentially liable defendant for "creating risks of harm." To complete the analogy, if the victim in Paine had suffered a suppressed memory of that risk-creation as the result of the trauma of the rape and her ensuing seven-story fall (a completely plausible possibility), even while having a memory of the rape itself, her claim against the creator of the risk would have been timely if sued upon within two years after the suppressed memory had surfaced in her consciousness.

In the same way, Paine, id. at 511 cited Wood v. Ostrander, 879 F.2d 583 (9th Cir. 1989) favorably as "also illustrat[ing] the principle that officials violated the Constitution by gratuitously increasing the risks of crime." There too the offending state actor was a police officer who left the ultimate victim "stranded in a high-crime area," and the consequence was that she was raped by a third party. And there too the addition of a plausible parallel to Hicks' situation--memory of the rape but the traumatically-induced suppression of any recollection of how she came to be in the high-crime area and of who was responsible for leaving her there--would prevent the limitations statute from coming into play until some event kick-started the knowledge of those vital previously-suppressed facts.

Just so with Hicks. And that analysis demonstrates why none of the cases cited by the Movants in purported support of their motion to dismiss is relevant here. Not one of them treats with a limitations question commensurate with the one that has been posed for resolution by this Court. Although it is unnecessary to lengthen this opinion unduly by referring to and distinguishing the set of cases sought to be called upon by Movants, for all of them have the

8

common flaw of being out of point on the ground explained here, a few of Movants' references may be illustrative on that score.

Thus in terms of state law, Clay v. Kuhl, 189 Ill.2d 603, 727 N.E.2d 217 (2000) was about repressed memories regarding the direct cause of sexual abuse, with the other defendant (a religious society) sought to be lumped into the claim against the abuser. And on the Section 1983 side of the ledger, both United States v. Kubrick, 444 U.S. 111 (1979) and Devbrow v. Kalu, 705 F.3d 765 (7th Cir. 2013) are even further off point, for each presented an instance in which the perpetrator and the cause were both known by the plaintiff throughout, so that a later discovery that the harmful act was actionable was not enough to start the statute of limitations clock anew.[5]

## Conclusion

Statutes of limitations are in place to spare potential defendants from the peril of being sued in perpetuity. But that purpose is not at risk where defendants such as Movants are held to answer for the consequences of risks for which they themselves bear responsibility. For the reasons stated in this opinion, Movants' Dkt. No. 264 on the statute of limitations issue is denied.

_____
Milton I. Shadur
Senior United States District Judge

Date: January 4, 2017

---

[5] None of the other contentions by Movants as to why the statute of limitations has assertedly already run puts into question (let alone countering) the just-completed analysis. Hence there is no need to waste time or space by addressing them.