IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **CHRISTOPHER HICKS**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 13 C 989 |
| | ) |
| **BARRY CLARK**, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Many years after suffering the child abuse that forms the gravamen of his claims, Christopher Hicks ("Hicks") filed a 42 U.S.C. §1983 ("Section 1983") action charging violations of due process, failure to intervene and supervisory liability, as well as several related state law tort claims, against a number of defendants, including Elmira Wright ("Wright"), Brodie Westbrooks and UCAN (formerly known as Child and Family Services). Those claims stem from injuries that Hicks sustained while he was in the foster care system in the home of Gloria Jemison ("Jemison") between February 1974 and April 1981. This memorandum opinion and order will first deal with cross motions for what the litigants characterize as "summary judgment" (but in that respect see n.3) on the issue of whether UCAN can be held liable for the actions of "FamilyCare of Illinois" ("FCI") and will then address the motions to exclude potential opinion witnesses Dr. Robert Galatzer-Levy and M. Todd Henderson ("Henderson") and to strike the report of Dr. Ronald Davidson.

**<u>Background</u>**[1]

This Court recognizes that FCI oversaw Hicks' placement that underpins his claims and that UCAN currently carries out the relevant services that FCI performed while Hicks was in the foster care system. Because this Court presumes the reader's familiarity, based on its past orders, with the tragic details of Hicks' history in the foster care system,[2] the ensuing discussion will focus on the history of FCI and UCAN.

FCI (originally known as "Chicago Home for the Friendless") was created in 1859 by the Illinois legislature to help the poor (H. St. ¶¶ 3-4). In the early 2000s FCI had funding issues due to the state's financial struggles, and it had to start shutting down programs (id. ¶¶ 18-20). FCI first got rid of the Cook County component of its foster care program in November 2001, then eliminated its downtown offices and imposed salary and staff reductions (id. ¶ 22). According to UCAN and FCI's Executive Director Carl Koerner ("Koerner"), FCI looked to a partnership with UCAN, an organization that did similar work, in an effort to "preserve its assets and strengthen its programs" (id. ¶ 24). Given UCAN's funds and FCI's experience, it made complete sense to bring the two together.

On July 29, 2004 FCI and UCAN executed a Letter of Intent stating that the entities sought to "merge and consolidate all of [FCI's] assets, liabilities and on-going business into

---

[1] This District Court's LR 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon. This opinion cites to Hicks' response to defendants' LR 56.1 statement as "H. St. ¶ --" and to defendants' response to Hicks' LR 56.1 statement as "D. St ¶ --". All of the factual statements that follow are undisputed unless specifically noted otherwise.

[2] Most relevant to this opinion are the facts that Hicks was abused in the foster home of Jemison, was removed from the home and then after a hearing was returned to that same home under the continued supervision of Wright, a caseworker who knew Jemison personally.

UCAN" (id. ¶ 31). Those entities then entered into a subsidiary arrangement outlined in an August 2004 letter, with FCI designating UCAN as its sole member, making FCI "in essence, a subsidiary of UCAN." (id. ¶ 36). That letter also asserted that "UCAN does not assume any responsibilities for the debts or obligations of" FCI (id. ¶ 38). UCAN agreed to assume liability for FCI starting after the transaction, but it tried to ensure that it would not be liable for any past actions or omissions of FCI (see id. ¶¶ 40-42). Although many called the transaction between UCAN and FCI a merger, there is disagreement between the parties as to whether it was a merger or more of an acquisition, with Hicks arguing the former.

UCAN explains that after the transaction it and FCI combined their existing foster care programs into a new program called "Professional Foster Parenting" (id. ¶ 63). According to Koerner, FCI continued to exist as an organization after the transaction with UCAN (for example, it continued to own property). In addition FCI's Board of Directors met twice after the 2004 transaction, although UCAN was the sole member of FCI (id. ¶¶ 50-51). There was also movement of staff, with at least some former members of FCI becoming part of UCAN (id. ¶¶ 52-56). According to defendants FCI existed until 2007, when it filed a notice of cancellation as a registrant under the Charitable Trust and the Solicitation for Charity Act (id. ¶ 6).

Hicks argues that the transaction was a merger and that FCI continued to exist after the transaction only on paper. While there were still a couple of FCI Board meetings after the transaction, all three members of that Board were UCAN executives, and those members admitted they were not conducting business as FCI (H. St. ¶¶ 30, 33). FCI did not make any new contracts, and any of its old contracts that were renewed were done under UCAN's name. After the transaction FCI did not run any of its own programs, have its own budget, enter into any contracts, have any office space separate from UCAN, maintain any of its own bank accounts or

- 3 -

renew its line of credit (id. ¶¶ 39-44). FCI also allowed its DCFS license to lapse after the transaction (id. ¶ 55), and a government filing referred to the transaction as a merger several times (id. ¶¶ 60-62).

## Summary Judgment Standards

Every Fed. R. Civ. P. ("Rule") 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" in resolving motions for summary judgment (Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists, and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

As with any claimed Rule 56 motion (in that respect, again see n.3), this opinion accepts each nonmovant's version of any disputed facts, but only so long as it is supported by record evidence. Where as here cross motions for summary judgment are involved, the principles of Rule 56 demand a dual perspective that this Court has sometimes described as Janus-like: It must credit the nonmovant's version of any disputed facts as to each motion, and that can on occasion lead to the denial of both motions. Fortunately that consequence has not eventuated here.

**Cross-Motions on Successor Liability Issue**

This Court grants Hicks' motion for partial summary judgment[3] on the successor liability issue. UCAN must be held responsible for FCI's earlier actions because the two entities in effect merged during the 2004 transaction. Even had there not been a de facto merger (as there was), there is clearly enough to find such liability here under the doctrine of corporate veil piercing.

To find possible liability for UCAN, there must be an exception to the general rule of successor nonliability. <u>Workforce Solutions v. Urban Servs. of Am., Inc.</u>, 2012 IL App (1st) 111410 at ¶ 86, 977 N.E.2d 267, 284 (2012) (internal citation omitted) has identified those exceptions:

> (1) where there is an express or implied agreement of assumption [of liability]; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations.

Here the most relevant exception is the second, where a transaction amounts to a de facto merger.

Under Illinois law courts will find a de facto merger when four factors exist (well set out in <u>Steel Co. v. Morgan Marshall Indus., Inc.</u>, 278 Ill. App. 3d 241, 248, 662 N.E.2d 595, 599 (1st Dist. 1996)):

> (1) there is a continuity of the business enterprise between seller and buyer, including continuity of management, employees, location, general business

---

[3] "Partial summary judgment" is not really an accurate label for such a motion, for a decision on a legal issue does not give rise to a "judgment," as would be the consequence (for example) of a final determination on a discrete claim for relief -- something that could be coupled with a Rule 54(b) determination. But the "partial summary judgment" usage, though technically inaccurate, is still a useful locution for situations such as the one dealt with here.

operations and assets; (2) there is continuity of shareholders, in that shareholders of the seller become shareholders of the buyer so that they become a constituent part of the buyer corporation; (3) the seller ceases operations and dissolves as soon as possible after the transaction; and (4) the buyer assumes those liabilities and obligations necessary for the uninterrupted continuation of the seller's business.

Taking those factors into consideration, any reasonable factfinder must conclude that a de facto merger occurred between UCAN and FCI. All parties agree to facts reflecting a continuity of management, employees, shareholders, general business operations and assets. And there was a clear agreement by UCAN to assume all future liabilities of FCI. All that is subject to potential question is whether FCI ceased operations and dissolved "as soon as possible after the transaction," but on that score defendants have failed to show any meaningful continuation of FCI, with the members of the FCI shareholders' meetings admitting that they did not discuss separate FCI business. All of those facts together are more than sufficient to overcome the attempt by UCAN to rid itself of liability for FCI's actions by keeping FCI alive on paper for a few extra years.

Once again, even if the 2004 transaction had not qualified as a de facto merger (as it has), this Court would still not allow UCAN to escape liability for the acts of FCI. Under the equitable doctrine of corporate veil piercing, FCI's "owner" -- UCAN -- is liable for FCI's acts where the two factors identified in <u>In re Rehab. of Centaur Ins. Co.</u>, 238 Ill. App. 3d 292, 300, 606 N.E.2d 291, 296 (1992) exist:

> First, there must be such a unity of interest and ownership that the separate personalities of the corporation and the dominating individual or entity no longer exist. Second, the facts must be such that an adherence to the fiction of separate corporate existence would endorse a fraud or promote injustice.

In evaluating the first of those factors -- separation of interest and personality between two entities -- courts consider several elements, including (1) inadequate capitalization, (2) failure to

issue stock, (3) failure to observe corporate formalities, (4) nonpayment of dividends, (5) insolvency of the debtor corporation, (6) nonfunctioning of the other officers or directors, (7) absence of corporate records, (8) commingling of funds, (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors, (10) failure to maintain arms'-length relationships among related entities and (11) whether, in fact, the corporation is a mere façade for the operation of the dominant stockholders (see <u>Gass v. Anna Hosp. Corp.</u>, 392 Ill. App. 3d 179, 186, 911 N.E.2d 1084, 1091 (5th Dist. 2009)). No one element is dispositive, and the movant need not establish all of the elements to prevail (<u>id.</u>; <u>Roiser v. Cascade Mountain, Inc.</u>, 367 Ill. App. 3d 559, 567, 855 N.E.2d 243, 251 (1st Dist. 2006)). Here nearly all of the those elements are present, with FCI failing to behave in any way as a normal corporation after the transaction with UCAN and with the evidence pointed to by defendants adding up to nothing more than a façade.

As for the second <u>Centaur</u>-identified factor, that too is plainly present here, for the injustice of adhering to the fiction of separate corporate existence is inherently clear. If this Court were to refuse holding UCAN liable for FCI's prior bad acts, any children hurt by FCI would have no way to seek justice. And if successor entity UCAN were to commit bad acts on its own, the State of Illinois could shuffle its foster care system once again in an attempt to shun all previous liability -- something completely contrary to the interest of justice.

Thus this Court must and does grant Hicks' Dkt. No. 236 motion and deny UCAN's Dkt. No. 273 cross motion in this area. This opinion will go on to deal with the litigants' remaining contested motions.

issue stock, (3) failure to observe corporate formalities, (4) nonpayment of dividends, (5) insolvency of the debtor corporation, (6) nonfunctioning of the other officers or directors, (7) absence of corporate records, (8) commingling of funds, (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors, (10) failure to maintain arms'-length relationships among related entities and (11) whether, in fact, the corporation is a mere façade for the operation of the dominant stockholders (see <u>Gass v. Anna Hosp. Corp.</u>, 392 Ill. App. 3d 179, 186, 911 N.E.2d 1084, 1091 (5th Dist. 2009)). No one element is dispositive, and the movant need not establish all of the elements to prevail (<u>id.</u>; <u>Roiser v. Cascade Mountain, Inc.</u>, 367 Ill. App. 3d 559, 567, 855 N.E.2d 243, 251 (1st Dist. 2006)). Here nearly all of the those elements are present, with FCI failing to behave in any way as a normal corporation after the transaction with UCAN and with the evidence pointed to by defendants adding up to nothing more than a façade.

As for the second <u>Centaur</u>-identified factor, that too is plainly present here, for the injustice of adhering to the fiction of separate corporate existence is inherently clear. If this Court were to refuse holding UCAN liable for FCI's prior bad acts, any children hurt by FCI would have no way to seek justice. And if successor entity UCAN were to commit bad acts on its own, the State of Illinois could shuffle its foster care system once again in an attempt to shun all previous liability -- something completely contrary to the interest of justice.

Thus this Court must and does grant Hicks' Dkt. No. 236 motion and deny UCAN's Dkt. No. 273 cross motion in this area. This opinion will go on to deal with the litigants' remaining contested motions.

**Opinion Witness Qualification Standards**

Plaintiffs offer opinion testimony from three potential witnesses pursuant to Fed. R. Evid. 702. For their testimony to be admissible under that Rule it must satisfy the two-part test first set out in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and later extended to fields of nonscientific expertise in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). As reflected both in Kumho and in the essentially contemporaneous amendment to Evid. Rule 702 with its accompanying Committee Note,[4] the Supreme Court eliminated any then-existing question as to whether the district courts' "gatekeeping" function applied to all expert testimony, not just testimony based on science.

In brief, that previously debated question was answered with an unconditional "yes." And that made it irrelevant which of the various sources of expertise listed in Evid. Rule 702 informed a designated expert's opinions, although the standards for testing the opinion may differ. For example, on the one hand most disciplines do not implicate peer review, which Daubert, 509 U.S. at 593 had specified as one relevant standard in the area of "scientific" knowledge, while on the other hand aspects of the scientific method may well be employed (or

---

[4] As a then member of the Judicial Conference's Advisory Committee on the Rules of Evidence, this Court chaired the subcommittee in charge of drafting the proposed amendments to Evid. Rules 701, 702 and 703 and the Committee Note to those amendments. On that score the principal draftsman was the truly outstanding reporter to the Committee, Fordham Law School Professor Daniel Capra (talk about expert!), while this Court had the privilege of working with him most closely in that drafting task. In an instance of particular serendipity, the resulting work product had been approved by the Advisory Committee and the Judicial Conference's Standing Committee and was out for public comment just at the time when Kumho came before the Supreme Court -- and the Supreme Court then cited the Committee Note approvingly in the course of its opinion (526 U.S. at 156-57). As a result the Committee Note was in turn revised to reflect the Kumho decision, and the final product then cleared the Standing Committee, the Judicial Conference and the Supreme Court so as to become effective on December 1, 2000. And as a parenthetical matter of personal pride, this Court was honored to be named as the Chairman of the Advisory Committee during the course of those events.

may indeed be required) to reach valid opinions in fields not labeled as demanding "scientific" knowledge.

What remains as the common core for any Evid. Rule 702 opinion under <u>Daubert</u>-<u>Kumho</u> is that the opinion be both reliable and relevant (<u>Daubert</u>, 509 U.S. at 590-91, 597; <u>Kumho</u>, 526 U.S. at 547). As to reliability, our Court of Appeals uses two evaluative criteria: "whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable" (<u>Masters v. Hesston Corp.</u>, 291 F.3d 985, 991 (7th Cir. 2002)). And as for relevancy, Evid. Rule 702 requires that the witness' testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." Consistent with both the overall design of the Evid. Rules and the plain language of Evid. Rule 401, the federal courts are unanimous in holding that the definition of relevant is expansive and inclusive (<u>Sprint/United Mgmt. Co. v. Mendelsohn</u>, 552 U.S. 379, 387-88 (2008); <u>Daubert</u>, 509 U.S. at 587) and that the standard for admissibility is very low (see, e.g., <u>United States v. Needham</u>, 377 Fed.App'x 84, 85-86 (2d Cir. 2010)). It is worth noting that even if this Court allows testimony to be included in these preliminary stages, it will not necessarily dictate how much weight the same testimony is to be given at later stages of the proceedings.

**Motion To Exclude Dr. Galatzer-Levy as a Witness**

Despite arguments to the contrary from defendants, Dr. Galatzer-Levy's testimony meets both (1) the reliability test of being qualified as well as trustworthy and (2) the relevancy requirement. He is clearly qualified, with extensive experience working with children in the DCFS system and those who have suffered child abuse. Defendants do not argue against his qualifications, instead seeking to challenge the reliability and relevance of his testimony. They dispute reliability by arguing that Dr. Galatzer-Levy never spoke directly to Hicks about

damages and that there are no testable scientific methods for his conclusions, with Dr. Galatzer-Levy relying only on his own expertise. They also contend that his testimony is not relevant because it is non-specific in distinguishing injuries that took place before Hicks was removed for the first time versus injuries that occurred as a result of UCAN letting Hicks return to the house.

Given how long ago those injuries took place, it was not necessary for Dr. Galatzer-Levy to speak to Hicks directly -- instead it was enough for him to examine all of the old documents as someone with experience in looking at similar documents. That methodology is reliable, as those in this field routinely rely on reviewing previously prepared medical records (see, e.g., Walker v. Soo Line R., 208 F.3d 581, 588 (7th Cir. 2000), stating that "[m]edical professionals have long been expected to rely on the opinions of other medical professionals in forming their opinions"). In-person treatment has not been held to be necessary, and it is particularly unnecessary in a case such as this where there had been no formal diagnosis, where some 35 years have passed and where there is almost no memory on Hicks' part. Moreover, Dr. Galatzer-Levy's explanation of his reasoning will allow another qualified expert to review the same materials and apply his or her analysis based on relevant experience, thus making Dr. Galatzer-Levy's conclusions testable.

Dr. Galatzer-Levy's testimony is also clearly relevant, for it will assist the trier of fact in considering both whether Hicks could reasonably forget the details of the abuse and why he did not report it sooner. There is no legal authority to which defendants have pointed that holds testimony that identifies a specific damages amount is necessary for opinion witness testimony to be relevant. And because Hicks is seeking damages for the entire period of defendants' involvement in his case dating back to at least March 1977, there is no need to separate harm

caused by specific acts of abuse -- although defendants can argue that foster care played no role at all, on that score Gayton v. McCoy, 593 F.3d 610, 619 (7th Cir. 2010) teaches:

> As we have held on many occasions, an expert need not testify with complete certainty about the cause of an injury; rather he may testify that one factor could have been a contributing factor to a given outcome.

In sum, given the several reasons supporting both reliability and relevancy, Dr. Galatzer-Levy's testimony readily qualifies as appropriate for an opinion witness. Defendants' Dkt. No. 244 motion is denied.

### Motion To Exclude Henderson as a Witness

Hicks withheld responding to defendants' motion to exclude Henderson's testimony while awaiting this Court's ruling on the Rule-56-related motions. With this opinion's having granted Hicks' motion in that respect, Henderson's testimony on that legal issue is no longer relevant and thus it will not be used in the case. Hence the motion for Henderson's exclusion (Dkt. No. 247) is denied on mootness grounds, for there is no need for this Court to rule on it.

### Motion To Strike Dr. Davidson's Testimony

Defendants do not attempt to exclude Dr. Davidson as a witness -- instead they seek to strike his testimony due to a claimed lack of reliability. They urge that his report about the accuracy (or lack of accuracy) of Wright's testimony should not be admitted because his opinions are speculative, baseless and inconsistent with the factual record. They also claim that it is improper for opinion witness testimony to relate to a witness's credibility and impermissible for Dr. Davidson to give an opinion as to the role that Wright had in the court decision. Because those contentions do not attack the qualifications of Dr. Davidson or the relevance of his reports, the only issue remaining is reliability.

But those arguments fail as a direct attack on the reliability of Dr. Davidson's testimony. Dr. Davidson is well qualified to testify as to normal practices of DCFS. Although defendants might have sought to proffer an opinion witness to rebut that testimony, they have not chosen to do so.

To shift from the general to the specific, ample evidence exists of a relationship between Wright and Jemison, of abuse under Wright's supervision, of the return of Hicks to such abuse and of an inconsistency in the evidence when it comes to the claim from Wright that she objected to that return, on all of which Dr. Davidson can base his opinions. His opinions do not directly judge Wright's truthfulness, they contain views based on evidence that happens to contradict Wright's testimony -- a routine procedure followed by opinion witnesses. Indeed, Dr. Davidson's opinions are further bolstered by the fact that defendants' motion to strike did not point to any precedential decisions that reject the opinions of a case worker -- instead they cite several easily distinguishable non-precedential cases.

In brief summary, Dr. Davidson is qualified, his methodology is reliable and his opinions will be helpful to a trier of fact. Importantly he does not opine about Wright's motives, and his opinions as to the inconsistency of her claims that she tried to prevent the return of Hicks to Jemison's home are not inadmissible just because defendants disagree with them. Again one of defendants' motions (this time Dkt. No. 253) is denied.

## **Conclusion**

In sum, Hicks' Dkt. No. 236 motion is granted, while defendants' Dkt. No. 273 motion is denied. Defendants' motions to exclude Dr. Galatzer-Levy as a witness (Dkt. No. 244) and to strike Dr. Davidson's testimony (Dkt. No. 253) are denied, and their Dkt. No. 247 motion to

exclude Henderson as a witness is denied as moot. This case will next have a status hearing to discuss further steps after it is reassigned to one of this Court's colleagues.

                                                      _____
                                                      Milton I. Shadur
                                                      Senior United States District Judge

Date: August 8, 2017